

JUDGE CAPRONI

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BESI NORTH AMERICA INC.,

    Plaintiff,

v.

BANK OF AMERICA CORPORATION d/b/a BANK OF AMERICA MERRILL LYNCH,

    Defendant.

---

Case No.

**COMPLAINT**

Plaintiff Besi North America Inc. ("Besi" or "Plaintiff") brings this action for reimbursement and damages against Defendant Bank of America Corporation d/b/a Bank of America Merrill Lynch ("BAML" of "Defendant"). For its complaint, upon knowledge as to Besi and otherwise upon information and belief, Besi alleges as follows:

## NATURE OF THE ACTION

1. This is an action for a mandatory refund pursuant to 12 C.F.R. § 210.25 and U.C.C. § 4A–204 in connection with a series of unauthorized wire transfers out of Besi's bank account at BAML, and for damages arising out of BAML's negligence and breaches of its fiduciary duties and duty of good faith in monitoring, examining, and processing those transfers.

2. The unauthorized funds transfers involve a series of highly unusual, large currency transactions made within a period of twelve days to various unknown beneficiaries in China from an account normally used for inter-company payments. The orders for payment were transmitted to BAML by, or at the request of, Besi's Vice President of Finance, David Eagan, who had been misled by an imposter, who approached Eagan posing as Besi's Chief

1

Executive Officer and ordered Eagan to make the payments. The unauthorized payments that BAML executed amount to $2,698,677.60.

3. As one of the nation's largest commercial banks, which processes numerous wire transfers every day, BAML has knowledge of, and experience with, monitoring and detecting suspicious and potentially fraudulent banking transactions that are vastly superior to those of its customers. BAML is in a vastly superior position to appreciate risks, monitor and identify suspicious activity, recognize unusual patterns, employ heightened scrutiny to international wire transfers that involve banks in countries and regions that may qualify as high-risk, and to decide which payment orders require further investigation. Indeed, federal law and regulations require banks to take these steps to monitor and report large currency transactions and in certain cases identify the business purpose of such transactions.

4. BAML did not appropriately investigate any of the unauthorized payment orders before executing them, even though they involved very substantial sums of money that were being paid outside the ordinary course of business and should have been easily recognizable as suspect to the trained eye.

5. For example, the first of the wire transfers failed and was returned because the funds were wired to an account that did not exist. This failed wire transfer and the reason for its failure should have raised a red flag for an experienced commercial bank, and at least triggered further investigation, because creditors of an account receivable this large (in excess of one million dollars) can reasonably be expected to be more careful when communicating their payment instructions, and bona fide businesses should know where they bank and under what name.

6. A second red flag was that the substitute payment order to replace the first

transaction involved a different beneficiary altogether—an individual rather than a business—at a different bank, which is suspicious if the payment genuinely concerned a business debt.

7. It should have been a further warning sign to BAML that the succession of different beneficiaries at different banks continued: within six days over one million dollars to another individual and four days later over half a million to another company with still a different bank.

8. A fourth red flag was the fact that BAML kept receiving new payment orders every few days—a total of four large currency transactions in succession within the short time span of twelve days—which was a highly unusual pattern in the context of Besi's transaction history.

9. Further warning signs were the unusual destination of the payments—China—and the fact that each of the wire transfers went to third parties, while Besi's bank account was routinely used only for inter-company transfers.

10. Before processing the unauthorized payment orders, BAML did not follow in good faith any procedure agreed-upon with Besi or any commercially reasonable security procedure. Indeed, it has no procedure in place to verify payment orders with anyone other than the purported sender, or to check the authorizations for the payments themselves.

11. With respect to one of the payment orders, BAML's client manager for Besi, Jane Papia, called Eagan on December 2, 2013, to verify whether he was the sender of the payment order transmitted a few days earlier. But she did so only after BAML had already processed two other payment orders without making the same inquiry; and BAML did not repeat the procedure before sending another half a million dollars to an unknown beneficiary in China four days later. Nor did BAML ever check with Besi whether any of the payment orders had been duly

authorized by the requisite number of authorized persons at Besi.

12. BAML was aware that, prior to any transmission of payment orders, Besi's internal procedures require payment orders to be authorized or approved by at least two persons.

13. BAML was also aware of the fraud risks associated with its customers' (including Besi's) use of BAML's proprietary CashPro software, which enables individual customer representatives to execute transmissions of payment orders to BAML without need for a second reviewer to log on to transmit the payment order. BAML instituted no agreed-upon or commercially reasonable procedure to protect against those risks.

## THE PARTIES

14. Plaintiff Besi North America Inc. is a leading supplier of semiconductor assembly equipment for global semiconductor and electronics industries. It is incorporated in Delaware and has its principal place of business in Salem, New Hampshire. Besi is a subsidiary of BE Semiconductor Industries N.V., a Dutch corporation with worldwide operations, headquartered in Duiven, the Netherlands.

15. Defendant Bank of America Corporation d/b/a Bank of America Merrill Lynch is a bank holding company incorporated in Delaware and headquartered in Charlotte, North Carolina. It does business under the name "Bank of America Merrill Lynch," which is its corporate and investment banking division headquartered in New York City.

## JURISDICTION AND VENUE

16. This Court has subject matter jurisdiction over the claims asserted in this action pursuant to 28 U.S.C. §§ 1331 and 1367, as Plaintiff's claim for a refund arises under federal law, and its claims for damages under state law are so related to that claim that they form part of the same case or controversy. This Court also has subject matter jurisdiction over the claims

asserted in this action pursuant to 28 U.S.C. § 1332, because the amount in controversy exceeds $75,000 and there is complete diversity of citizenship between the Plaintiff and the Defendant in this matter.

17. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) because the sole Defendant resides in this District.

## FACTUAL ALLEGATIONS

### Besi's Account at BAML

18. On or about October 24, 2005, Besi's predecessor-in-interest, Laurier, Inc., opened a bank account with BAML, which was later transferred into Besi's name. The account was to be used, and was in fact used in the following years up to its recent closure, primarily for inter-company payments within the Besi group of companies and rarely, if ever, to unaffiliated third parties. Payments from the account required the approval and consent of two authorized persons. At all relevant times, BAML was aware of Besi's dual authorization requirements.

19. As part of BAML's banking relation with Besi, BAML agreed to provide Besi with monitoring services geared towards fraud protection and detection and account safety, including assisting with managing and reconciling credit and debit activity in Besi's account, monitoring debit entries, identifying unauthorized debits and other irregularities and unusual activities known as "exceptions" in the account, helping identify fraudulent checks, and investigating unauthorized use of cards associated with the account.

20. BAML also provided an array of advisory services. It expressly committed to providing financial guidance, and announced to its customers that as part of its banking services, it may recommend ways to manage liquidity and assist with cash forecasting, and provide information reporting services to help customers control and manage their accounts. It further

advised its customers to perform daily back-ups of their data, and provided customers with advice concerning fraud protection and measures against identity theft. BAML's services further included advising on which services best meet a customer's needs.

21.     Through these and other representations, BAML held itself out as an advisor to Besi and as highly skilled in monitoring for fraudulent activity and protecting its customers against fraud. Besi relied, and could reasonably rely, on BAML to actively engage in fraud detection and prevention, monitor payment orders for unusual, unauthorized, and fraudulent requests, timely contact Besi concerning suspicious activity relating to Besi's account, and to hold those payment orders pending further inquiry and confirmation.

## Applicable Procedures for the Transmission of Payment Orders

22.     As part of the banking services provided in connection with Besi's account at BAML, BAML offered Besi the use of BAML's Direct Payment Initiation system, an online service that enabled clients to directly communicate payment orders for electronic wire transfers to BAML for further processing. A crucial feature of this system was that a person with permission from BAML's customer to transmit payment orders to BAML could use a special user name and passcode to log on to the service and pass on payment orders, after they received internal authorization, to BAML. BAML required (and still requires) BAML to maintain a written list of persons with permission to transmit payment orders to BAML. Such persons need not themselves be the persons to authorize or approve the payments to be made from their company's BAML account.

23.     When BAML's Direct Payment Initiation services were first set up in 2005 for Besi's predecessor, Laurier, Inc., the sole person with permission to transmit authorized payment orders was Thomas Bassett, who at that time was Laurier's Vice President of Finance. He has

6

since left the company.

24. On or about April 2013, BAML migrated to a new online payment order transmission system by the name of CashPro. On or about that same time, BAML sent new user names and passwords to two people at Besi: David Eagan, Vice President of Finance, and Valerie Lanigan, who is a member of Eagan's staff. The use of these user names and passwords enabled Eagan and Lanigan to transmit to BAML orders for payment from Besi's account at BAML in the form of wire transfer requests.

25. Besi never expressly gave Eagan or Lanigan permission to transmit payment orders to BAML through CashPro. Upon information and belief, BAML does not maintain a written list that includes Eagan or Lanigan as persons permitted to transmit payment orders to BAML.

26. Eagan and Lanigan are also not authorized to single-handedly order, approve, or sign off on payments from Besi's BAML bank account.

**The Unauthorized Wire Transfers**

27. Between November 25, 2013 and December 6, 2013, BAML processed four highly unusual wire transfers to four different beneficiaries at three different banks in China.

28. One of the transfers was processed after Eagan was defrauded by an unknown third party into transmitting a payment order; the other payment orders were transmitted by Lanigan, who acted at Eagan's request. None of these payment orders were properly authorized.

*The November 25 Transfer*

29. On or about November 25, 2013, Lanigan sent an unauthorized order for payment of $1,074,838.80 (the U.S. dollar equivalent of €796,000) to BAML to be electronically wired to an account at Standard Chartered Bank in Hong Kong in the name of Quick Full Group Limited.

Because BAML knew that at least two persons were required to sign off on payment orders, it had no basis to simply presume that such dual approval had been given for this payment order. BAML made no effort, however, to contact anyone at Besi concerning this payment order or request proof that the appropriate two persons had authorized the payment order. Instead, BAML processed the wire transfer, without any inquiry, to Quick Full Group Limited, a beneficiary wholly unknown to either BAML or Besi.

30. Upon information and belief, BAML's internal procedures require confirmation of the payment order from BAML's client and, following such confirmation, approval from a BAML supervisor.

*The November 26 Transfer*

31. Shortly after BAML's November 25 wire transfer was processed, the transfer was returned as unsuccessful because the account information provided to BAML proved inaccurate. Using the CashPro system, Lanigan then sent BAML account information for a different beneficiary, Wen Feng Ying, to receive payment in lieu of Quick Full Group Limited. Because BAML knew that two persons were required to sign off on payment orders, it had no basis to simply presume that such dual approval had been given for this payment order.

32. Despite the fact that the new account information involved a different beneficiary with a different account at a different bank (Bank of China) to substitute as beneficiary of the same payment—and in particular the fact that an unknown individual was being substituted for a corporation to receive payment of a debt purportedly owed to the corporation—BAML made no effort to contact anyone at Besi concerning this payment order or request proof that the appropriate two persons had authorized the payment order. BAML also made no effort to inquire about the payment order with its sender, Lanigan, or with Eagan.

8

33. Instead, BAML processed the wire transfer, without any inquiry, to a Bank of China account in Hong Kong, belonging to Wen Feng Ying, a beneficiary wholly unknown to either BAML or Besi.

*The December 2 Transfer*

34. On or about December 2, 2013, BAML made a third payment from Besi's bank account based on a payment order that Besi had not authorized. The payment again involved the U.S. dollar equivalent of €796,000 (at that time $1,073,838.80) and, while obviously a related transaction, again involved a different beneficiary. The beneficiary, an individual by the name of Guan Qion Fen, is also wholly unknown to either BAML or Besi.

35. Upon BAML's receipt of the December 2 payment order, a BAML employee, Jane Papia, who was the client manager for the Besi account, placed a phone call to Eagan (the very person whose permission to transmit the unauthorized payment order BAML was supposed to verify), a procedure BAML had not followed with respect to the November 25 and November 26 payment orders. As part of this inquiry, Ms. Papia only verified with Eagan whether he had meant to send the payment order.

36. Because BAML knew that two persons were required to sign off on payment orders, it had no basis to simply presume that such dual approval had been given for this payment order. BAML made no effort to contact anyone at Besi to verify if Eagan's payment order had been authorized, let alone request proof of the dual authorizations that Besi's internal procedures require. Instead, BAML processed the wire transfer, without further inquiry, to the unknown Guan Qion Fen's bank account at a Bank of China branch in Hong Kong.

*The December 6 Transfer*

37. On or about December 6, 2014, BAML made a fourth payment from Besi's bank

9

account based on a payment order that Besi had not authorized. Lanigan and/or Eagan provided BAML with account information for Stanley Industrial (HK) Ltd., again a different beneficiary wholly unknown to either BAML or Besi, with a bank account at Shanghai Pudong Bank. BAML had no basis to simply presume that dual approval had been given for this payment order.

38. Despite the fact that this new account information involved a similar and ostensibly related transaction within a time frame of less than two weeks (and merely four days after the previous payment order), but yet again a different and unknown beneficiary with a different account at a different bank, BAML made no effort to contact anyone at Besi to verify if Eagan's payment order had been authorized, let alone request proof of the dual authorizations that Besi's internal procedures require. Nor did BAML call to verify the authenticity of the payment order itself with the sender, Lanigan, or with Eagan. Instead, BAML processed $550,000, without further inquiry, to the unknown Stanley Industrial (HK) Ltd.'s in China.

39. As a result of BAML's unauthorized wire transfers from Besi's account, Besi lost a total of $2,698,677.60 to unknown criminals in China, when its BAML account was debited with that amount.

## COUNT I

### (Refund pursuant to 12 C.F.R. § 210.25(b)(1) and UCC § 4A--204)

40. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 39, as if fully set forth herein.

41. Between November 25 and December 6, 2013, BAML accepted a series of payment orders that were issued in the name of Besi as the sender.

42. The payment orders were not authorized and not effective as orders of Besi and not enforceable against Besi.

10

43. Between November 25 and December 6, 2013, BAML carried out the payment orders and made the funds transfers from Besi's bank account, in whole or in part, through Fedwire.

44. In verifying the payment orders and processing the funds transfers, BAML did not follow or comply in good faith with an agreed-upon or commercially reasonable security procedure.

45. As a direct result of BAML's unauthorized funds transfers and its failure to follow an agreed-upon or commercially reasonable security procedure in good faith, Besi has suffered substantial harm and is entitled to a refund or recredit to its account in the amount of $2,698,677.60, plus interest from the date of receipt of the payment orders.

46. Section 210.25(b) of Regulation J, Subpart B, 12 C.F.R. § 210.25(b), applicable to funds transfers of which any part is carried out through Fedwire, incorporates the provisions of Article 4A of the Uniform Commercial Code ("UCC"), which provide, in pertinent part, that "[i]f a receiving bank accepts a payment order issued in the name of its customer as sender which is (i) not authorized and not effective as the order of the customer . . . the bank shall refund any payment of the payment order received from the customer . . . and shall pay interest on the refundable amount . . . ."

## COUNT II
### (Breach of Fiduciary Duty)

47. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 46, as if fully set forth herein.

48. Between Besi and BAML, there was a relationship of trust and confidence that gave rise to a fiduciary duty on the part of BAML. As part of this fiduciary relationship, BAML had committed to assuming an advisory role and Besi reposed confidence in BAML, its bankers

11

for nearly a decade, and reasonably relied on BAML's superior expertise in and knowledge of monitoring and detecting suspicious and potentially fraudulent banking transactions.

49. By its actions described above, BAML breached its fiduciary duties, including by failing to properly appreciate and act on known fraud risks, monitor and identify suspicious activity, recognize unusual patterns, employ heightened scrutiny to international wire transfers that involve banks in countries and regions that need to be classified as high-risk, and timely investigate the November 25, November 26, December 2, and December 6, 2013 payment orders.

50. BAML also breached its fiduciary duty by failing to follow in good faith any appropriate security procedures with regard to the November 25, November 26, December 2, and December 6, 2013 payment orders, verify the authenticity of the payment orders, and/or seek confirmation from Besi that the funds transfers had been duly authorized.

51. As a direct result of BAML's breaches, Besi has suffered harm, including but not limited to pecuniary loss the costs of investigating and recovering the unauthorized payments, and consequential damages.

### COUNT III
### (Negligence)

52. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 51, as if fully set forth herein.

53. Based on Besi's and BAML's longstanding relationship of trust going back nearly a decade, in which BAML clearly appreciated its duty to properly monitor potentially fraudulent transactions, to give advice concerning the fraud risks associated with the use of its CashPro online direct payment system, and to warn against those risks, BAM owed Besi a duty of care.

54. BAML was imminently aware of the risk of fraud and identity theft, associated with the use of BAML's online direct payment system, CashPro.

55. Because of the highly unusual character of the payment orders and a series of other red flags described above, the possibility of criminal fraud was imminently foreseeable for BAML, which is an experienced and sizable commercial bank.

56. BAML breached its duty by failing to properly monitor the November 25 – December 6 payment orders, and detect and prevent a detectable and preventable fraud.

57. BAML further breached its duty by failing to make additional inquiries concerning the authenticity and proper authorizations for the November 25 – December 6 payment orders after a series of warning signs should have put BAML on inquiry notice of the ongoing fraud, and by processing these payment orders without regard to any agreed-upon or commercially reasonable security procedure. BAML breached its duty by failing to seek confirmation and inquire, for example, with Eagan's supervisors or the persons at Besi authorized to make or approve payments.

58. As a direct result of BAML's breaches, Besi has suffered harm, including but not limited to pecuniary loss, the costs of investigating and recovering the unauthorized transfers, and consequential damages.

## COUNT IV
### (Breach of Contract - Duty of Good Faith and Fair Dealing)

59. Plaintiff repeats and re-alleges each and every allegation contained in paragraphs 1 through 39, as if fully set forth herein.

60. BAML and Besi, or its predecessor-in-interest, have been in a contractual banking relation since at least 2005. As part of their contractual relation, BAML owed Besi a duty of good faith and fair dealing.

61. By ignoring, or failing to notice or act upon, the red flags surrounding the November 25 – December 6 payment orders and transfers discussed above, BAML breached its duty to act in good faith and observe reasonable commercial standards of fair dealing.

62. As a direct and proximate result of BAML's breaches, Besi has suffered harm, including but not limited to pecuniary loss, the costs of investigating and recovering the unauthorized transfers, and consequential damages.

63. Besi performed all its obligations under the contract.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment for the following relief:

a. compensatory damages in an amount to be determined at trial;

b. pre-judgment interest from the date that BAML received the payment orders and debited Besi's account, and post-judgment interest from the date of entry, until the date of satisfaction at the highest rates allowable by law;

c. reasonable attorneys' fees and costs incurred by Plaintiff in this action; and

d. such additional relief, legal or equitable, to which Plaintiff may be entitled.

## JURY TRIAL DEMANDED

Plaintiff requests a trial by jury.

New York, New York
May 8, 2014              Respectfully submitted,

                BOIES, SCHILLER & FLEXNER LLP

                By: _____
                Olav A. Haazen (ohaazen@bsfllp.com)
                333 Main Street
                Armonk, New York 10504
                Tel.: (914) 749-8200
                Fax: (914) 749-8300

                *Attorneys for Plaintiff Besi North America, Inc.*